## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2001 NOV -8 A 11: 05
CLERK'S OFFICE
AT BALTIMORE
DEPUTY

MICROFILMED
NOV 8

| | | |
|---|---|---|
| DAVID GRAFF | ) | |
| | ) | |
| Lead Plaintiff | ) | |
| | ) | Civil No. JFM-00-3080 |
| v. | ) | |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| | ) | |
| Defendants | ) | |
| ***** | | |
| CARL GOLDMAN | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3179 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |
| JERRY TOWBIN | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3212 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |
| IRWIN BERLIN | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3253 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |
| THEODORE ROLE | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3305 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |
| LOUIS CAROLA | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3571 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |
| ROBERT CORWIN | ) | |
| | ) | |
| v. | ) | Civil No. JFM-00-3629 |
| | ) | |
| PRIME RETAIL, INC., et al., | ) | |
| ***** | | |

<u>MEMORANDUM</u>

Plaintiffs, a group of investors, have brought suit under the Securities Exchange Act of 1934, alleging violations of § 10(b) and § 20(a), as well as a violation of Securities and Exchange Commission Rule 10b-5. They claim that Defendants, Prime Retail and its top officers, made material misstatements and omissions in the months preceding an announcement by Prime Retail that it would suspend its dividend. This announcement caused the company's stock price to plummet. Defendants have moved to dismiss for failure to state a claim, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, <u>et seq</u>. Defendants also have moved under Federal Rule of Civil Procedure 12(f) to strike Paragraph 44 of Plaintiffs' Consolidated Amended Complaint. For the reasons stated below, Defendants' Motion to Dismiss will be granted. The Motion to Strike will be denied.

I.

Defendant Prime Retail owns and develops outlet shopping centers nationwide. A real estate investment trust or REIT, the company went public in 1994. Its stock price soared as it made acquisitions, expanded internationally, and accumulated a solid record of paying dividends to shareholders. In January of 2000, however, Prime Retail announced that it would not pay a common-stock dividend for the fourth quarter of 1999. Its stock price promptly sank, and this suit followed.

Plaintiffs, headed by a group of investors called The Marsh Group, purchased Prime Retail common stock between May 28, 1999 and January 18, 2000. This class period was

intended to coincide[1] with the announcement by Prime Retail that it had broken ground on an outlet center in Puerto Rico, its first international project. The end date of the class period marks the announcement by Prime Retail that it would suspend its dividend, and that an important measure of its financial health, funds from operations (FFO),[2] would be lower than expected in 2000. Plaintiffs name Prime Retail and five of its officers as defendants.

Plaintiffs allege that Defendants violated the securities laws by making material misstatements and omissions concerning the Puerto Rico outlet center, the condition of outlet centers Prime Retail acquired from Horizon Group Inc., and the likelihood that Prime Retail would continue paying dividends to shareholders in the future. The alleged misstatements and omissions occurred in a number of contexts, including the company's second- and third-quarter 1999 press releases, various analysts' reports, and a newspaper article.

Plaintiffs claim that Prime Retail's August 12, 1999 press release, which reported the company's second-quarter results, was false and misleading because it stated that Prime Retail likely would be able to "reduce [its] overall level of indebtedness" and would have "substantial capital to fund its development pipeline" as a result of the sale of three outlet centers. The release did not reveal that Prime Retail had not secured a construction loan for the Puerto Rico mall, which meant the company would have to finance the project with its own funds. Nor did it indicate that the Horizon Group properties that Prime Retail had acquired in 1998 were

---

[1] The press release announcing the groundbreaking is actually dated May 28, 1998, not May 28, 1999, as Plaintiffs allege in the Consolidated Amended Complaint. (Mem. in Supp. of Defs.' Mot. to Dismiss at 3 n.1.) Plaintiffs conceded in oral argument that the release therefore is outside the class period. It thus is not actionable here.

[2] FFO is a combination of net income and real property depreciation and amortization. It is a measure of cash flow out of which dividends are paid. (Consolidated Am. Compl. at 16 n.1.) As a REIT, Prime Retail does not pay corporate income taxes; instead, it must distribute 95 percent of its income to shareholders in the form of dividends. (Id. ¶ 19.)

3

deteriorating, that Prime Retail's ability to continue paying its dividend was in jeopardy, or that Prime Retail's plans for future development were tenuous due to the company's financial situation.

Prime Retail issued a press release announcing its third-quarter earnings on November 8, 1999. Plaintiffs criticize a statement in that release by Abraham Rosenthal, chief executive officer of Prime Retail and one of the named defendants, that Prime Retail's "core operating portfolio continues to perform well as evidenced by our third quarter FFO of $0.38 per share[,] which is in-line with consensus estimates." (Mem. in Supp. of Defs.' Mot. to Dismiss App. B.) Plaintiffs allege that this statement is misleading because it did not disclose that Prime Retail had only been able to pay its third-quarter dividend after borrowing $20 million -- a fact that Plaintiffs contend demonstrates that the company would not be able to pay a dividend in the fourth quarter.

Plaintiffs also cite "numerous representations" by Prime Retail, indirectly through analysts, to the effect that Prime Retail would be able to pay its fourth-quarter dividend. (Consolidated Am. Compl. ¶ 51.) On August 13, 1999, David M. Fick of Legg Mason Wood Walker Inc., who followed Prime Retail more closely than any other analyst, wrote that Prime Retail's management "has assured the investment community repeatedly that Prime's current dividend is sacred." (Id.) On October 1, 1999, Fick noted that "[m]anagement stated to us this week that continued payment of the common dividend remains 'sacrosanct.'" (Id. ¶ 52.) On October 15, 1999, Defendant Robert P. Mulreaney, Prime Retail's chief financial officer, and Defendant Rosenthal were reported to have told analysts that Prime Retail "is committed to the current dividend" and has flexibility "to meet its capital needs for the foreseeable future." (Id. ¶ 53.) On November 18, 1999, Prime Retail officials were reported by a J.P. Morgan analyst to be

4

"fully committed" to the dividend. (Id. ¶ 57.) The J.P. Morgan report said management would not cut the dividend to buy back Prime Retail shares because it said it felt a "contractual obligation" to shareholders. (Id.) Finally, several times in November and December of 1999, Fick reiterated that "[m]anagement has repeatedly expressed confidence that there are no circumstances under which the dividend would be cut" and that "PRT's management repeatedly has stated its commitment to paying its common dividend." (Id. ¶¶ 56, 58.) In addition to the alleged statements and omissions in the press releases and analyst reports, Plaintiffs claim that Defendants provided false and misleading guidance to Kartik Mehta, an analyst for Midwest Research Inc., who was quoted in a November 15, 1999 Washington Times article as saying that Prime Retail "is fundamentally very strong." (Id. ¶ 30.)

After Prime Retail announced on January 18, 2000, that its board of directors had voted to suspend its common dividend, the company's stock price promptly fell by 37 percent. Just days before this nosedive, a negative report by Fick had led to a 25 percent decline in Prime Retail's stock price.

Defendants move to dismiss on various grounds. Key among them are that Defendants are not responsible for statements made by analysts, and that statements made by Defendants themselves are not actionable because they either were accurate reports of current results or immaterial forward-looking statements.

II.

A.

In order to establish liability under § 10(b) of the Securities Exchange Act or SEC Rule 10b-5,[3] a plaintiff must prove that, in connection with the purchase or sale of a security, the defendant made: (1) a false statement or omission of a material fact, (2) with the requisite scienter, (3) provoking justifiable reliance by the plaintiff, (4) that proximately caused plaintiff's damages. See, e.g., Longman v. Food Lion, Inc., 197 F.3d 675, 681 (4th Cir. 1999), cert. denied 529 U.S. 1067 (2000); Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 208 (4th Cir. 1994); Malone v. Microdyne Corp., 26 F.3d 471, 476 (4th Cir. 1994).

The pleading of these elements is governed by both Federal Rule of Civil Procedure 9(b), which requires fraud to be pled with particularity, and the PSLRA, which requires the plaintiff to plead with particularity each alleged misrepresentation or omission in a private securities action. See In re Ciena Corp. Sec. Litig., 99 F.Supp.2d 650, 657 (D. Md. 2000). According to the PSLRA, the complaint must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs here have failed to plead a claim for relief under the first prong of the four-part test for a violation of § 10(b): the requirement of a false statement or omission of material fact. I

---

[3] Because I do not find evidence of a violation of §10 or Rule 10b-5, I do not address Plaintiffs' § 20(a) claim, which alleges that the individual defendants were "controlling persons" who violated and caused Prime Retail to violate § 10(b) and Rule 10b-5. See, e.g., Genna v. Potts, 1995 WL 222043, at *5 n.7 (D. Md. 1995) ("Without 'primary liability' under § 10, there can be no 'secondary' controlling person liability under § 20.").

will examine the alleged misstatements and omissions identified by Plaintiffs in two categories: those contained in press releases and those made to and by analysts.

B.

Plaintiffs allege that materially false and misleading statements or omissions occurred in the August 12, 1999 second-quarter press release and the November 8, 1999 third-quarter press release. Neither, however, contained an actionable misstatement or omission under the securities laws.

1.

Plaintiffs point to what they consider to be numerous material misstatements or omissions in the second-quarter press release. Their primary focus is on a statement made by Defendant Rosenthal that Prime Retail's "upcoming sale of three outlet centers for $274.0 million <u>will provide</u> our Company with substantial capital to fund our development pipeline and to reduce our overall level of indebtedness" (emphasis added). (Mem. in Supp. of Defs.' Mot. to Dismiss Ex. A.) Plaintiffs contend the statement was false and misleading for four reasons.

First, Plaintiffs allege that the statement failed to disclose that the company did not have a construction loan for its Puerto Rico project, thus rendering "highly questionable" the company's ability to reduce overall debt. (Consolidated Am. Compl. ¶ 50(1).) In essence, Plaintiffs argue that Prime Retail would be forced to channel money from the sale of the three outlet centers to the Puerto Rico project, rather than using the money to reduce its overall indebtedness. As defendants point out, and on its face, this argument appears somewhat paradoxical, since the failure to secure a loan for the Puerto Rico project obviously kept the company's overall debt from rising, at least in the short term.

Further, the statement upon which Plaintiffs base their objection was generalized and future-oriented. It expressed the company's hopes and plans for the $274 million but lacked specifics or a timetable for achieving the goals. The Fourth Circuit has held that projections are generally actionable only if they constitute guarantees or are supported by "specific statements of fact," neither of which are present in this comment. Malone, 26 F.3d at 479; see also Raab v. Gen. Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993); Genna, 1995 WL 222043, at *3 (D. Md. 1995). Plaintiffs' disagreement with Defendant Rosenthal's optimism is not tantamount to proving his comment was false when made. See, e.g., Longman, 197 F.3d at 682-83 (requiring a material statement to be false or misleading to make out a claim for securities fraud); Hillson Partners, 42 F.3d at 213 (finding that plaintiffs had failed to allege that defendant did not believe statement was inaccurate when made).

Plaintiff's second argument is that the second-quarter release failed to disclose a "rapid[] deterioration" in the properties Prime Retail acquired from Horizon Group, which led to increased vacancies and which Plaintiffs allege would require substantial capital to rectify. (Consolidated Am. Compl. ¶ 50(2).) In other words, Plaintiffs allege a material omission. However, the alleged omission does not render existing statements misleading, which would make it actionable. See 17 C.F.R. § 240.10b-5 (2001) (making it unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading. . . ."). Plaintiffs have alleged no facts demonstrating that alleged day-to-day management problems at the properties[4] would

---

[4] Plaintiffs cite unnamed former employees of Prime Retail as sources for a litany of problems at the former Horizon Group outlet centers. Those problems included failure to market, remodel, expand, and maintain the centers (Consolidated Am. Compl. ¶ 25); failure to keep up the premises by mowing lawns and painting buildings (id. ¶ 27); an increase in "red

foreclose the future opportunities for debt reduction and development about which Rosenthal spoke.

Nor has Prime Retail failed to disclose a matter which it had a duty to disclose. See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) (noting that "[s]ilence, absent a duty to disclose, is not misleading"); Walker v. Action Indus., Inc., 802 F.2d 703, 706 (4th Cir. 1986) (explaining that liability under Rule 10b-5 for omissions or nondisclosure requires a "duty to speak"). Plaintiffs point to no obligation Defendants had to separately report on the status of former Horizon Group outlet centers. Defendants did report in the second-quarter release on "same-space" and "same-store" sales in Prime Retail properties overall for the first half of 1999. In fact, these two distinct measures of sales pointed in different directions, with one slightly up compared to a year earlier and the other slightly down. (Mem. in Supp. of Defs.' Mot. to Dismiss App. A.)

At most, then, Plaintiffs allege a failure by Prime Retail to disclose general mismanagement. However, such claims are not actionable under the securities laws. See, e.g., In re USF&G Corp. Sec. Litig., 1993 WL 740188, at *5 (D. Md. 1993), aff'd Rabinovits v. USF&G Corp., 16 F.3d 411 (4th Cir. 1994) (finding a claim involving alleged corporate mismanagement to be "essentially a claim for breach of fiduciary duty" and not actionable under

---

tape" that led to higher vacancies (id. ¶ 28); a hold on the ordering of supplies (id. ¶ 38); and a failure to pay bills on time (id. ¶ 40).

    Assuming without deciding that the sources are sufficiently identified, failure to present these details to investors in conjunction with second-quarter earnings do not constitute material omissions. As the Supreme Court made clear in Basic, Inc. v. Levinson, 485 U.S. 224 (1988), public companies are not obliged to report every detail of their operations. See id. at 231. Setting the standard for materiality "too low," the Court stated, "might bring an overabundance of information within [the reach of the securities laws], and lead management 'simply to bury the shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decisionmaking.'" Id. (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

9

the securities laws).

Third, Plaintiffs allege that the second-quarter release was misleading because it did not reveal that Prime Retail's ability to continue paying its dividend was in jeopardy. (Consolidated Am. Compl. ¶ 50(3).) The release included information about the second-quarter dividend, but no projections as to future dividends. This is not an actionable omission. The law does not require Prime Retail to have known in August of 1999 that its dividend would be in jeopardy in January of 2000. Even if the company did have indications in August that the dividend was imperiled, five months existed during which the company might have addressed the potential perils. See, e.g., Hillson Partners, 42 F.3d at 213 ("[A]n inability to foresee the future does not constitute fraud.") (citation omitted); In re USF&G, 1993 WL 740188, at *6 (citing "established rule that economic prognostication is not actionable under the securities laws").

Fourth and finally, Plaintiffs allege the second-quarter release was misleading because it did not reveal that it was unlikely that Prime Retail actually would have capital "to fund [its] development pipeline." (Consolidated Am. Compl. ¶ 50(4).) This argument fails for the reasons cited above. A company may discuss future hopes and plans without rendering itself vulnerable to a lawsuit if those plans do not materialize. As the Fourth Circuit stated in Raab: "[H]indsight does not establish fraud. If it did, any drop in the price of shares would result in lawsuits from disappointed investors." 4 F.3d at 291. In sum, the second-quarter press release contains no material misstatements or omissions.

2.

Plaintiffs' objection to the third-quarter earnings release centers on Rosenthal's statement that Prime Retail's "core operating portfolio continues to perform well as evidenced by our third quarter FFO of $0.38 per share . . . ." (Mem. in Supp. of Defs.' Mot. to Dismiss Ex. B.)

Plaintiffs do not challenge the accuracy of Prime Retail's reported FFO, which is a measure of cash generated by Prime Retail's properties. They note instead that this statement did not disclose that Prime Retail had been able to pay its third-quarter dividend only after securing a short-term $20 million loan under onerous terms, which bode poorly for the company's ability to pay a dividend in the future.

While the third-quarter release does not disclose the $20 million loan, Prime Retail's publicly available financial report for the quarter does reveal the debt. In the Form 10-Q financial statement filed with the SEC on November 15, just a week after the press release was issued, Prime Retail revealed the loan and its high interest rate of 15 percent. (Id. Ex. K.) Shortly after the report was filed, Fick, the Legg Mason analyst, reported on the loan. (Id. Ex. I.) Prime Retail's increasing debt load prompted Fick to wonder whether the company would have "necessary funds to pay the dividend going forward . . . ." (Id.) He concluded his December 10, 1999 report on a negative note: "While risk tolerant investors may find a 20% dividend attractive and see significant upside potential in PRT [Prime Retail] shares, we will stay away until the company is able to access funds and complete transactions at a lower cost of capital, all else being equal." (Id.)

Although hardly a model of forthrightness, Prime Retail did disclose its debt load, including the $20 million loan, to the market. See, e.g., Raab, 4 F.3d at 289 (noting that, in fraud on the market cases, failure to disclose material information may be excused where the information at issue "has been made credibly available to the market by other sources") (internal citation omitted). The fact that Fick knew about the loan underscores the public availability of this information.

Plaintiffs' argument that the third-quarter release was misleading because it failed to reveal the risk to the fourth-quarter dividend is similarly unconvincing. Prime Retail's statement was not about the prospects for a dividend in the fourth quarter, and no where did Defendants discuss the fourth quarter in their third-quarter press release. Defendants were under no obligation to forecast future performance in an announcement of results from a quarter just past. See In re Manugistics, 1999 WL 1209509, at *2 (D. Md. 1999). The third-quarter press release thus contains no actionable misstatements or omissions.

### C.

#### 1.

Plaintiffs next allege that statements Prime Retail officials made to analysts – that the dividend was "sacred" and "sacrosanct" and that Prime Retail was "committed" to the dividend and considered paying it akin to a "contractual obligation" – are actionable. None of these statements can form the basis of securities fraud, however, for two different reasons.

First, the statements were mere puffery or projections and thus not actionable. See, e.g., Malone, 26 F.3d at 479 (holding that statement that is "purely a projection" is not actionable); In re Manugistics, 1999 WL 1209509, at *2 (holding that soft or puffing statements are not actionable as misrepresentations); see also Genna, 1995 WL 222043, at *2, *4 (discounting as inactionable "expressions of optimism" such statements as "we continue to feel that the current monthly dividend level . . . will be sustained" and "[w]e're still optimistic that we can maintain the . . . dividend"). The descriptions of the dividend as "sacred" and "sacrosanct" are so obviously exaggerated that a reasonable investor would not credit them as being a useful, reliable part of the mix of information available on Prime Retail. See Basic, 485 U.S. at 231-32 (defining materiality); see also, e.g., Phillips v. LCI Int'l, Inc., 190 F.3d 609, 615 (4th Cir. 1999)

12

(explaining that "hyperbole and speculation cannot give rise to a claim of securities fraud"); cf. Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 200-01 (3d Cir. 1990) (identifying puffery, in the context of sales of securities, to include statements that are exaggerated, such as "You cannot lose," or vague, such as "This bond is marvelous").

Second, even if I were to find that declaring a dividend "sacrosanct" and describing the commitment to pay it as akin to a "contractual obligation" constituted guarantees, Plaintiffs' claims still fail because Prime Retail did not control the analysts to whom the comments were reportedly made. In Raab, the Fourth Circuit declined to attribute to the defendant company a research report stating that the company "ha[d] indicated" a relevant fact to analysts. 4 F.3d at 288. Raab emphasized that companies cannot be held liable for analyst reports absent some indication of control over the content of those reports -- evidence that, as in Raab, is lacking. Id. at 288-89. As the Fourth Circuit explained:

> The securities laws require [the company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company]. Without control over [the analyst's] report, any statement made by [company] personnel could be taken out of context, incorrectly quoted, or stripped of important qualifiers.

Id. at 288. Plaintiffs made no allegation that the analysts they cite were not independent of Prime Retail. Additionally, Plaintiffs do not plead with specificity, except in the case of the October 15, 1999 meeting with analysts, which Prime Retail officials provided the information to the analysts or how it was provided. Failing to plead the identity of the speakers of alleged material misstatements is a critical defect. See id.

Plaintiffs try to circumvent Raab by arguing that they are not asking the court to find the company was entangled with analysts. Instead, Plaintiffs suggest, they are arguing that the

analysts "recounted <u>directly and first-hand</u> what they heard" and are "the equivalent of any other source" (emphasis in original). (Pls.' Opp'n to Defs.' Mot. to Dismiss at 8.) Nothing in the Fourth Circuit's opinion in <u>Raab</u> suggests that the court would recognize this distinction. To the contrary, the Fourth Circuit's expressed concern that a defendant's statement to an analyst "could be taken out of context, incorrectly quoted, or stripped of important qualifiers," assumes that the analyst has "recounted directly and first-hand what . . . [he] heard."

2.

Plaintiffs' allegations regarding the November 15, 1999 <u>Washington Times</u> article also do not state a viable claim for securities fraud. The article quoted an analyst as saying that Prime Retail was "fundamentally strong" and a Prime Retail official as saying that the company's "core operations continue to perform as we expect but we're disappointed in where our common stock is trading." As discussed above, there is no evidence that Prime Retail controlled the analyst who was quoted, nor even that its officials had spoken to the analyst. Thus, the company cannot be liable for providing "false and misleading" guidance to the analyst, as Plaintiffs contend. (Consolidated Am. Compl. ¶ 31.) In addition, Prime Retail would have no power to dictate the contents of statements appearing in an independent newspaper. <u>See, e.g.</u>, <u>Hillson Partners</u>, 42 F.3d at 216 n.10 (indicating that it is "not at all clear . . . that liability with respect to statements made in a newspaper article is appropriate when a defendant lacks control over the article").

Finally, the quote from the Prime Retail official adds nothing to Plaintiffs' claim because Plaintiffs have not demonstrated that the statement was false or misleading: Prime Retail's properties may have been performing as expected, and the company likely was genuinely disappointed with its stock price. Neither necessarily imply that Prime Retail's core portfolio was performing well, or that the stock was being undervalued by the market. The article thus

provides no basis for a claim of securities fraud.

III.

A.

Defendants also have moved to strike Paragraph 44 of Plaintiffs' Consolidated Amended Complaint on the ground that it is immaterial and scandalous. The paragraph contains allegations regarding Michael Reschke, who was chairman of the board of Prime Retail. It alleges:

> Defendant Michael Reschke owned the land on which [Prime Retail's] Puerto Rico outlet was to be built. The former regional marketing manager for Prime Retail states that Reschke's individual ownership of the land was the reason that Prime Retail embarked upon the project in Puerto Rico. This information was not disclosed to investors.

(Consolidated Am. Compl. ¶ 44.)[5]

Defendants charge that the allegation in Paragraph 44 is supported only by an apparent rumor, and that it is false, harmful, and irrelevant to the underlying case. They assert that Reschke did not own the Puerto Rico land. As evidence, they offer a deed showing that Prime Retail bought the land from a partnership called Desarrolladora Piloto, S.E., whose managing partners were Miguel Redondo Borges and Jorge Redondo Borges. (Defs.' Mem. in Supp. of Mot. to Strike App. A.)

---

[5] Defendants have not moved to strike the portion of ¶ 6 of the Consolidated Amended Complaint that contains similar allegations. It states that "the real reason for embarking on the [Puerto Rico] project was that the land on which the center was to be developed was owned by Defendant Michael Reschke."

15

B.

The Federal Rules of Civil Procedure give a court discretion to strike from any pleading "any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Such motions are disfavored, however, and usually should be denied unless the allegations "have no possible relation to the controversy and may cause prejudice to one of the parties." 5A Wright & Miller, Federal Practice and Procedure § 1382 (2d ed. 1990); see also United States ex rel. Ackley v. Int'l Bus. Mach. Corp., 110 F.Supp.2d 395, 405-06 (D. Md. 2000) (applying standard). Further, motions to strike should be denied if there is any doubt as to whether the material in question raises an issue of fact or law. Wright & Miller at § 1382; cf. Morton v. Town of Wagram, 2001 WL 68232, at *2 (M.D.N.C. 2001) (refusing to strike paragraph of complaint unless it had "no possible bearing" on the litigation) (citation omitted).

In this case, there is a material issue of fact regarding the paragraph Defendants seek to strike. The deed they offer lists only the managing partners of Desarrolladora Piloto, the partnership that sold the Puerto Rico land to Prime Retail. It is not clear whether the partnership had other partners, and whether, if it had other partners, Reschke was among them. Nor do Defendants foreclose the possibility that Reschke was involved in selling the land to the partnership. If Reschke were a partner in Desarrolladora Piloto, or if he sold the land to the partnership, he may have stood to gain from the transaction. The allegations thus are neither immaterial nor scandalous.

A separate order effecting the rulings in this memorandum is attached.

Date: November 8, 2001

J. Frederick Motz
United States District Judge